# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**BEGASHAW AYELE**,                          Chapter 7
    Debtor                          Case No. 10-22282-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**BEGASHAW AYELE**,
    Plaintiff,
v.                                           Adv. P. No. 10-1328
**EDUCATIONAL CREDIT MANAGEMENT CORPORATION**,
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Amended Complaint filed by Begashaw Ayele ("Mr. Ayele" or the "Debtor") against Educational Credit Management Corporation ("ECMC"), through which Mr. Ayele seeks a discharge of his student loan obligations, totaling $30,605.83 as of October 20, 2011, pursuant to 11 U.S.C. § 523(a)(8).   In his

1

Complaint, Mr. Ayele, who has appeared in his Chapter 7 case and this adversary proceeding *pro se*, has alleged that, based upon his current financial circumstances, repayment of his student loans would constitute an undue hardship. He asserts that he would be unable to maintain a minimal living standard if he were required to repay the loans.

ECMC answered the Complaint, and the Court issued a Pretrial Order. In compliance with that order, the parties filed a Joint Pretrial Memorandum in which they stipulated to facts which are admitted and require no proof. The Court conducted a trial on November 2, 2011. At the trial, Mr. Ayele was the only witness. Because he appeared *pro se*, the parties agreed that Mr. Ayele could provide a narrative statement as his direct examination, that ECMC's counsel could then cross-examine him, and that Mr. Ayele could provide a further narrative statement in rebuttal.

In accordance with Fed. R. Bankr. P. 7052, the Court now makes the following findings of fact and conclusions of law. The only issue is whether Mr. Ayele sustained his burden of establishing that repayment of his student loan debt would impose an undue hardship upon him.

## II. FACTS

A. <u>The William D. Ford Direct Loan Program</u>

Prior to the commencement of the trial, the Court took judicial notice of the William D. Ford Federal Direct Loan Program (the "Ford Program"), which was enacted by Congress pursuant to 20 U.S.C. § 1087a *et seq.*, and is contained within the Code of Federal

Regulations, *see* 34 C.F.R. §§ 685.100 through 685.402.  The Ford Program provides for

student loan consolidation under the guaranteed student loan program, *see* 34 C.F.R. §

685.220(b), and an income contingent repayment plan ("ICR Plan").  *See* 34 C.F.R. § 685.209.

Under that plan, according to information provided by ECMC,

> the monthly payment amount is calculated as <u>the lesser of</u>: (a) the amount
> that would be paid if the borrower repaid the loan in 12 years, multiplied by
> an annual income percentage factor that varies based upon the borrower's
> annual income; <u>or</u> (b) 20% of the borrower's discretionary income, which is
> defined as the borrower's adjusted gross income ("AGI") minus the poverty
> level for the borrower's family size.

The Health and Human Services Poverty Guidelines, which are annually adjusted, are used

in determining monthly payment amounts under ICR Plans. *See* 34 C.F.R. § 685.209.  In

addition to ICR Plans, student loan borrowers may be eligible for the Income-Based

Repayment program (the "IBR program" ) as part of the Ford Program.  That program is

part of the College Cost Reduction and Access Act of 2007, which amended the Higher

Education Act of 1965. *See* 20 U.S.C. 1001 *et seq.* According to ECMC, which referenced a

publication from Federal Student Aid, an office of the United States Department of

Education, payments under the IBR program are annually adjusted based in part on

changes to the federal poverty guidelines.  ECMC summarized the program as follows:

> Under the IBR, the amount an eligible borrower would repay each month
> under the IBR is based on the Borrower's AGI and family size.  The annual
> IBR repayment amount is 15 percent of the difference between the
> borrower's AGI (or an alternate income amount) and 150 percent of the
> Federal HHS Poverty Guidelines, adjusted for family size.  That amount is
> then divided by 12 to get the monthly IBR repayment amount.  If that
> amount is higher than the 10-year standard repayment amount on the
> borrower's loans, then the borrower's required payment is the standard

amount. The repayment amount under a 10-year standard plan is calculated based upon the total.

B. Stipulated Facts and the Debtor's Testimony

The parties complied with the Court's trial procedure and Mr. Ayele provided a narrative of his educational background, employment history, marital and health status, and the reasons for his refusal to participate in the repayment plans for student loans available under the Ford Program.

Mr. Ayele, a native Ethiopian, is a 53 year old. He is divorced and has no minor children.[1] He filed a voluntary Chapter 7 petition on November 9, 2010. On Amended Schedule F-Creditors Holding Unsecured Nonpriority Claims, which he filed on December 22, 2010, he listed unsecured creditors holding claims totaling $34,867.91, including ECMC with a claim in the sum of $29,925.42.[2]

Mr. Ayele commenced the instant adversary proceeding on November 9, 2010, the same day he filed the Chapter 7 petition. He received a discharge of dischargeable debts

---

[1] In his original Complaint, he revealed that he first traveled to the United States as a tourist. He eventually became eligible for a "green card" and became a U.S. citizen.

[2] The Court notes that Mr. Ayele did not file Schedule I-Current Income of Individual Debtor(s). On Schedule J-Current Expenditures of Individual Debtor(s), he listed his average monthly income, ostensibly from an unfiled Schedule I, as $1,100.70. He calculated that sum by multiplying his hourly wage of $9.00 by the number of hours worked per day (seven), using a five day work week and a four week month. He deducted $159.30 from that sum for state and federal taxes. He utilized the sum of $1,260 as his monthly income on Form 22A, the Chapter 7 Statement of Current Monthly Income and Means-Test Calculation. In his Statement of Financial Affairs, he set forth an annual income of $16,780 for an unspecified year.

4

on March 29, 2011.[3]  In the Joint Pretrial Memorandum, the parties agreed that ECMC holds

three (3) federal student loans of the Plaintiff, as follows:

> i. A student loan that disbursed on February 19, 1991, under the federal
> Supplement Loan for Students Program ("SLS").  As of April 11, 2011 the
> loan had an outstanding balance of $12,186.87, of which $8,321.18 is for
> principal, $1,663.89 is for interest, and $2,350.20 is for costs. The loan has a
> variable interest rate currently of 3.54% and a per diem of .81 cents.

> ii. A student loan that disbursed on December 27, 1991, under the federal
> Guaranteed Student Loan Program ("GSLP"). As of April 11, 2011 the GSLP
> loan had an outstanding balance of $5,277.94, of which $3,664.67 is for
> principal, $607.13 is for interest, and $1,006.14 is for costs. The loan has a
> variable interest rate currently of 3.42% and a per diem of .34 cents.

> iii. A student loan that disbursed on February 19, 1992 under the federal SLS
> program. As of April 11, 2011 the loan had an outstanding balance of
> $12,618.94, of which $8,512.55 is for principal, $1,702.15 is for interest, and
> $2,404.24 is for costs.  The loan has a variable interest rate currently of 3.54%
> and a per diem of .82 cents.

Mr. Ayele has lived in the United States for 29 years.  During that time, he has not

succeeded in obtaining salaried employment and has only held hourly wage positions.  He

currently resides in South Boston, Massachusetts in housing provided by the Boston

Housing Authority for which he pays $405 per month.

Mr. Ayele has acquired several degrees from American educational institutions.  He

received an Associate Degree in Business Administration from South Central Community

College in New Haven, Connecticut in 1988,  and later a Bachelor of Science Degree from

---

[3] In his First Amended Complaint to Determine Dischargeability of a Student
Loan Debt, Mr. Ayele referenced a bankruptcy case which he commenced in
Connecticut in 1991.  He attempted to discharge his student loan debt in that case but
was unsuccessful.

Southern Connecticut State University in New Haven, Connecticut in 1992. He attended Boston University between 1996 and 2000 and received a Master of Science Degree in Administrative Studies, while he worked as a parking lot attendant for the University. Mr. Ayele explained that his benefit package included tuition, but that he was responsible for books and other educational materials.

Mr. Ayele worked for a company called Globe Aviation Service from May 5, 2005 to December 9, 2005. In December of 2005, Globe Aviation Service was purchased by another entity called G2 Secure Staff, LLC ("G2"). Mr. Ayele worked for G2 until November 19, 2010. While employed by those two companies, Mr. Ayele worked as a ramp agent and provided assistance for flights at Logan Airport. He worked approximately 35 hours per week, earning $9.00 per hour. Mr. Ayele did not state reasons why his employment ceased.

Although Mr. Ayele does not keep records of his expenses, he set forth his monthly expenses on Schedule J, which totaled $1,062. They include: 1) $405 for rent, including utilities; 2) $40 for cell phone usage; 3) $46 for cable and internet service; 4) $225 for food; 5) $25 for clothing; 6) $15 for medical and dental care; 7) $60 for a monthly MBTA pass; 8) $25 for recreation; 9) $25 for charitable giving; 10) $160 toward a garnishment payment which ceased when he filed for bankruptcy; and 11) $36 for printer ink, paper and software. Mr. Ayele also indicated that he sends money to his sister to support her and her family in Africa. He testified that the amount and timing of the payments varies depending upon his financial circumstances.

6

Mr. Ayele has been collecting unemployment payments of $700 per month for the past nine months.  At the time of trial, he testified that he was entitled to three additional months of unemployment benefits. Mr. Ayele has been unable to find employment since leaving G2.

Mr. Ayele testified that he has sent out over 600 resumes and job applications in his attempt to find employment suited to his educational level.  He testified that his inability to find suitable employment was due to racism or his accent.  At the present time, Mr. Ayele testified that he will no longer accept employment as a security guard or parking lot attendant.  He explained that if he accepted such employment "life will never change."  He added:  "All this job, it's out of mind. It was yesterday and it is now. I will never, never take that job to pay student loan."  Mr. Ayele  further explained that he wished to find employment as a paralegal or professional so that he could advance his career prospects.  Mr. Ayele also testified that he never considered a second, part-time job during the five year period when he worked as a ramp agent because he uses his free time writing a book and attending religious services on Sundays.

Mr. Ayele attempted to introduce written evidence pertaining to his medical conditions at trial.  Specifically, he attempted to submit medical records that show that his gallbladder was removed and that he is physically unable to stand for extended periods of time due to a leg problem.  Because of his physical limitations, Mr. Ayele maintained that he cannot apply for all types of jobs.  ECMC objected to the admission of Mr. Ayele's medical and other evidence on the basis of hearsay and lack of authentication.  The Court

7

sustained its objection.[4]

As noted above, the Court took judicial notice of the Ford Program and the student loan consolidation options that are available to debtors.  Mr. Ayele testified that obtaining the discharge of his student loan debt was the sole purpose of his decision to file a bankruptcy petition. At trial, he testified that he did not apply for a federal loan consolidation through the Ford Program, because he "want[ed] the Judge to decide [the case] based on [his] economic status." When asked if he would pay back his debts if he obtained a full time job, Mr. Ayele responded in the affirmative; when asked if he understood that under an ICR Plan or the IBR program his payments might be zero until such time as he could make enough money to support himself and his sister's family, he again responded in the affirmative.  Mr. Ayele chose not to apply to the Ford Program because he did not wish to be burdened by the knowledge of his continuing liability for the student loan debts as it would deprive him of his "peace of mind."  He explained:

> But the problem is I will get a job 16,000 a year.  If it is 15,000 I will not pay.
> If its 16,000, I will pay.  For the difference between 15 and 16 is 1,000.  For
> that 1,000 difference, you commit to pay the student loan, for years to come.

---

[4] In conjunction with his post-trial brief, Mr. Ayele filed an Appendix containing medical records, income and expense information, and Western Union telegrams showing money transfers to his sister in Ethiopia. ECMC filed a "Motion to Strike Portions of the Addendum and Brief filed by the Plaintiff." Mr. Ayele objected to ECMC's motion.  The Court shall enter an order granting the ECMC's Motion.  The Court, however, reviewed Mr. Ayele's submissions and notes that the medical records are not recent and that his testimony was adequate to illuminate his current health issues.  In short, the Court finds that, even if it were to consider Mr. Ayele's unauthenticated medical records and other documentary evidence, it would not affect the Court's decision as to the dischargeability of his student loans.  Accordingly, Mr. Ayele is not prejudiced by the allowance of ECMC's Motion to Strike.

So that really doesn't make sense.

He added, "it's not the issue of paying every month, but it's the issue of paying all the debt, including the interest, including the collection fee, whatever."  In short, he did not wish to admit that he owed obligations in excess of the principal or to commit to disclosing his future income, indicating that it was "another vicious cycle."

Mr. Ayele claims to be depressed and humiliated because he is unable to find professional employment with a Master's Degree.  He indicated that he also is hampered in finding employment because he does not own a motor vehicle, or even a bicycle. He stated that if he is unable to discharge his student loan debt, he will be forced to move back to Africa.

## III. POSITIONS OF THE PARTIES

Mr. Ayele maintains that repayment of his student loan debt would present an undue hardship because he cannot currently afford to repay the debt, and he is unlikely to be able to repay it in the foreseeable future.

ECMC argues that Mr. Ayele failed to sustain his burden of establishing the existence of undue hardship.  It asserts that Mr. Ayele failed to show that his future prospects are bleak enough to warrant the discharge of his student loan debt.  It concludes that his request for an exception to discharge must be rejected in view of his right to consolidate his debts under the Ford Program.

9

## IV. DISCUSSION

### A. Applicable Law

Under 11 U.S.C. § 523(a)(8), the creditor has the initial burden of establishing that the debt qualifies as the type excepted from discharge, and the debtor has the burden of establishing that excepting the debt from discharge will cause an undue hardship on the debtor or his or her dependents. *See* Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 796 (B.A.P. 1st Cir. 2010) (citations omitted). In Educ. Credit Mgmt. Corp. v. Stevenson (In re Stevenson), No. 08-1245, 2011 WL 3420428 (Bankr. D. Mass. Aug. 2, 2011), this Court recently addressed the legal standards governing the discharge of student loan debt, extensively referencing the decision of the United States Bankruptcy Appellate Panel of the First Circuit in Bronsdon. The Court repeats that discussion from Stevenson here.

> The Bankruptcy Code prohibits the discharge of student loan debt "unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). In determining whether a debtor has satisfied her burden in showing undue hardship, courts are split on the proper test to apply. Several circuit courts have adopted the Second Circuit's test set forth in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir.1987) ("the Brunner test"). The Brunner test is a three-part test which requires the debtor to prove:
>
> > (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
> > (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
> > (3) that the debtor has made good faith efforts to repay the

10

loans.

Brunner, 831 F.2d at 396. *See e.g.*, Educ. Credit Mgmt. Corp. v. Polleys, 356 F.3d 1302, 1309 (10th Cir. 2004); U.S. Dept. of Educ. v. Gerhardt (In re Gerhardt), 348 F.3d 89, 91 (5th Cir. 2003); Hemar Ins. Corp. v. Cox (In re Cox), 338 F.3d 1238, 1241 (11th Cir.), *reh'g denied*, 82 F. App'x 220 (11th Cir. 2003), *cert. denied*, 541 U.S. 991 (2004); Ekenasi v. Educ. Res. Inst. (In re Ekenasi), 325 F.3d 541, 546 (4th Cir. 2003); United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108, 1112 (9th Cir 1998); Pa. Higher Educ. Assistance Agency v. Faish (In re Faish), 72 F.3d 298, 306 (3d Cir. 1995), *cert. denied*, 518 U.S. 1009 (1996); and In re Roberson, 999 F.2d 1132, 1135 (7th Cir. 1993). *See also* Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler), 397 F.3d 382, 385 (6th Cir 2005) (in which the Sixth Circuit abandoned its hybrid-Brunner test and adopted the Brunner test).

Other courts have adopted "the totality of the circumstances test" which requires the court to consider "(1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and her dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case." Long v. Educ. Credit Mgmt. Corp. (In re Long), 322 F.3d 549, 554 (8th Cir. 2003). The United States Court of Appeals for the First Circuit has not adopted either test. In Nash v. Conn. Student Loan Foundation (In re Nash), 446 F.3d 188 (1st Cir. 2006), the First Circuit stated:

> We see no need in this case to pronounce our views of a preferred method of identifying a case of "undue hardship." The standards urged on us by the parties both require the debtor to demonstrate that her disability will prevent her from working for the foreseeable future. Appellant has a formidable task, for Congress has made the judgment that the general purpose of the Bankruptcy Code to give honest debtors a fresh start does not automatically apply to student loan debtors. Rather, the interest in ensuring the continued viability of the student loan program takes precedence. TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 937 (1st Cir.1995).

Nash, 446 F.3d at 190-91.

While the First Circuit has not adopted either test, this Court in Nash v. Conn. Student Loan Foundation (In re Nash), No. 02-1466, Slip op. (Bankr.

D. Mass. June 18, 2004), *aff'd*, 330 B.R. 323, 327 (D. Mass. 2005), and the
United States Bankruptcy Appellate Panel for the First Circuit have adopted
the "totality of the circumstances test." Bronsdon v. Educ. Credit Mgmt.
Corp. (In re Bronsdon), 435 B.R. 791, 801 (B.A.P. 1st Cir. 2010). The
Bankruptcy Appellate Panel, and the majority of courts in Massachusetts,
have adopted the "totality of the circumstances test" because "the Brunner
test 'test[s] too much'" and because the good faith requirement lacks support
within the language of § 523(a)(8). Bronsdon, 435 B.R. at 800-801. While
noting that undue hardship is measured at the time of trial, 435 B.R. at 800,
the panel in Bronsdon observed:

> Although the two tests do not always diverge in function, they
> do in form. In re Hicks, 331 B.R. at 26. As the In re Hicks court
> noted: "While under the totality of the circumstances
> approach, the court may also consider 'any additional facts and
> circumstances unique to the case' that are relevant to the
> central inquiry (i.e., the debtor's ability to maintain a minimum
> standard of living while repaying the loans), the Brunner test
> imposes two additional requirements on the debtor that must
> be met if the student loans are to be discharged." Id. (emphasis
> in original). Looking to the bankruptcy court's extensive
> analysis of the predominant tests in In re Kopf, the In re Hicks
> court agreed with In re Kopf that the Brunner test "test[s] too
> much." Id. at 27.

>> At first blush, the second Brunner requirement -
>> - a showing that the debtor's "state of affairs is
>> likely to persist for a significant portion of the
>> repayment period of the student loan"—seems
>> merely to resonate with the forward-looking
>> nature of the undue hardship analysis. That is,
>> under any undue hardship standard the debtor
>> must show that the inability to maintain a
>> minimum standard of living while repaying the
>> student loans is not a temporary reality, but will
>> continue into the foreseeable future.

>> Many courts interpreting and applying the
>> second Brunner prong, however, place
>> dispositive weight on the debtor's ability to
>> demonstrate "additional extraordinary

12

circumstances" that establish a "certainty of hopelessness." This has led some courts to require that the debtor show the existence of "unique" or "extraordinary" circumstances, such as the debtor's advanced age, illness or disability, psychiatric problems, lack of usable job skills, large number of dependents or severely limited education. . . . And, in the absence of such a showing, the court may conclude that the debtor has failed the second <u>Brunner</u> prong and the student loans will not be discharged. . . .

Requiring the debtor to present additional evidence of "unique" or "extraordinary" circumstances amounting to a "certainty of hopelessness" is not supported by the text of § 523(a)(8). The debtor need only demonstrate "undue hardship." True, the debtor must be able to prove that the claimed hardship is more than present financial difficulty. *See* <u>Kopf</u>, 245 B.R. at 742, 745. And the existence of any of the factors mentioned above may be highly relevant to a finding that the hardship will persist into the foreseeable future. But whether or not this Court subjectively views the debtor's circumstances as "unique" or "extraordinary" is, in a word, overkill.

<u>In re Hicks</u>, 331 B.R. at 27–28. We agree with this rationale and conclude that <u>Brunner</u> takes the test too far.

Furthermore, we agree that the "good faith" requirement of Brunner is "without textual foundation." <u>Id.</u> at 28 (citing <u>In re Kopf</u>, 245 B.R. at 741). Ultimately, the debtor must establish by a preponderance of the evidence that her present and future actual circumstances would impose an undue hardship if her debts are excepted from discharge. Irrespective of the test, the decision of a bankruptcy court, whether the failure to discharge a student loan will cause undue hardship to the debtor and the dependents of the debtor under § 523(a)(8),

13

rests on both the economic ability to repay and the existence of
any disqualifying action(s). The party opposing the discharge
of a student loan has the burden of presenting evidence of any
disqualifying factor, such as bad faith. The debtor is not
required under the statute to establish prepetition good faith
in absence of a challenge. The debtor should not be obligated
to prove a negative, that is, that he did not act in bad faith, and,
consequently, acted in good faith.

Bronsdon, 435 B.R. at 800-801 (footnote omitted).

In addition to adopting the "totality of the circumstances test," the
Bankruptcy Appellate Panel, in Bronsdon, determined that the availability
of the William D. Ford Direct Loan Program . . ., and the options offered
through that program to borrowers, in particular the Income Based
Repayment Plan . . . , was a factor to be weighed by the court but was not
dispositive as to the issue of undue hardship. It stated:

Courts considering the ICRP [Income Contingent Repayment
Plan] as a factor under the totality of the circumstances test
evaluate both the benefits and drawbacks of the program for
the individual debtor within his or her unique circumstances.
Brooks v. Educ. Credit Mgmt. Corp. (In re Brooks), 406 B.R.
382, 393 (Bankr. D. Minn. 2009). Although these courts
acknowledge that the ICRP reduces the  immediate debt
burden of the student loan debtor, they are often concerned
about the longer term debt and tax consequences of the
program. They recognize that, although it may be appropriate
to consider whether a debtor has pursued her options under
the ICRP, participation in that program may  not be
appropriate for some debtors because of the impact of the
negative  amortization of the debt over time when
payments are not made and the tax implications arising after
the debt is cancelled. Because of these considerations, the ICRP
may be beneficial for a borrower whose inability to pay is
temporary and whose financial situation is expected to
improve significantly in the future. *See* In re Vargas, 2010 WL
148632, at *4–5, 2010 Bankr.LEXIS 63, at *12–13. Where no
significant improvement is anticipated, however, such
programs may be detrimental to the borrower's long-term
financial health. *See* id.; *see also* In re Wilkinson–Bell, 2007

14

Bankr.LEXIS 1052,  at *16.

Central to this analysis is the idea that because forgiveness of
any unpaid debt under the ICRP may result in a taxable event,
the debtor who participates in the ICRP simply exchanges a
nondischargeable student loan debt for a nondischargeable tax
debt. Such an exchange of debt provides little or no relief to
debtors. *See* Thomsen v. Dep't of Educ. (In re Thomsen), 234
B.R. 506, 514 (Bankr. D. Mont. 1999); *see also* In re Booth, 410
B.R. at 675–76; Durrani v. Educ. Credit Mgmt. Corp. (In re
Durrani), 311 B.R. 496, 509 (Bankr. N.D. Ill. 2004), *aff'd*, 320 B.R.
357 (N.D. Ill. 2005); *but see* In re Brunell, 356 B.R. at 580–81
(holding that "[t]o the extent that the Debtor satisfies the
requirements for participation in the Ford program, any tax
liability based on the forgiven balance at that time is
discharged."). For example, in In re Booth, the bankruptcy
court stated:

> Application of the ICRP does not result in a
> discharge of the debt nor relieve the debtor from
> personal liability on the debt. Further action
> may, and will, be taken to collect the obligation,
> even if that action is simply requiring the debtor
> to provide annual financial information to the
> Department of Education. The ICRP does not
> grant a discharge, but lapse of a period as long as
> 25 years may result in cancellation or forgiveness
> of the debt. There is no provision in the
> regulation for "partial" cancellation or
> forgiveness of the obligation. Unlike a discharge,
> cancellation or forgiveness of a debt results in a
> tax liability. As interest accrues during the 25
> years or lesser repayment period, the amount of
> debt cancelled will be quite large. The resulting
> tax liability would not be subject to discharge in
> a later bankruptcy proceeding.

> The focus of the ICRP is on deferral, not
> discharge, of debt. This is the antithesis of a fresh
> start. Congress has provided bankruptcy debtors
> relief which is not provided in the ICRP

regulations. Compliance with ICRP regulations will not result in the same relief which can be granted by the courts under 11 U.S.C. § 523(a)(8).

410 B.R. at 675–76. In addition, many of these courts are concerned that the ICRP allows the Department of Education to substitute its administrative determination regarding undue hardship for the bankruptcy judge's statutorily mandated discretion under § 523(a)(8). *See* id.; *see also* In re Durrani, 311 B.R. at 509.

Bronsdon, 435 B.R. at 802-803.

Stevenson, 2011 WL 3420428 at *5- 9.

Following this Court's decision in Stevenson, the United States Court of Appeals for the First Circuit in an unpublished judgment, dated September 23, 2011, affirmed the decision of the United States Bankruptcy Appellate Panel in Bronsdon. It noted that the debtor had demonstrated undue hardship under both the totality of the circumstances test and the Brunner test. The First Circuit stated that it would not rule on which of the two tests is appropriate.

In Stevenson, the debtor argued that the ICR Plan and the IBR program were not an option for her because they would result in a tax liability. The Court rejected her assertion because the forgiveness of her loans through the IBR program or an ICR Plan would result in a tax liability only if her assets exceeded her liabilities when the loans were forgiven. 26 U.S.C. §§ 108(a)(1)(B), 108(d)(3). *See* Educ. Credit Mgmt Corp. v. Bronsdon, 421 B.R. 27, 34 (D. Mass. 2009), *vacating and remanding* Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), No. 08-1062, 2009 WL 95038 (Bankr. D. Mass. Jan. 13, 2009)

16

(rejecting as "legal error" Bankruptcy Court's conclusion that forgiveness of debt "would result" in a tax liability); *cf.* Bronsdon, 435 B.R. at 802 (noting that forgiveness of debt "may result" in a taxable event). In other words, the debtor in Stevenson would incur a tax liability arising out of loan forgiveness only if her future circumstances vastly improved - a circumstance which she claimed would not occur. This Court in Stevenson addressed the potential tax liability issue by giving the debtor the option to having any remaining debt discharged, rather than forgiven, at the end of the repayment period in order to avoid any potential tax impact. *See* Stevenson, 2011 WL 3420428 at * 11. This Court, citing 11 U.S.C. § 105(a), stated:

> Accordingly, rather than enter an order discharging a potential contingent and unliquidated tax debt without notice to appropriate governmental authorities, the Court shall enter an order discharging any student loan debt Ms. Stevenson is unable to repay following her participation in the Ford Program. If Ms. Stevenson were to participate in the Income Based Repayment Plan Option and so inform the Court, and if Ms. Stevenson faithfully abides by the terms and provisions of either the IBRP option or an ICRP, any student loan debt which she may have at the expiration of the plan is discharged.

Id.

B. Analysis

Regardless of whether this Court applies the Brunner test or the "totality of the circumstances test," the Court concludes that Mr. Ayele failed to satisfy his burden of establishing undue hardship as of the time of trial. Under the "totality of the circumstances test," which unlike the Brunner test does not "test too much," the Court first considers Mr. Ayele's past, present, and reasonably reliable future financial resources. Mr. Ayele has had

17

a long history of jobs paying between $9 and $10 per hour.  He currently is unemployed and is receiving unemployment benefits.  He testified that he will no longer seek employment in areas where he has succeeded in obtaining employment in the past. Although he has not been successful in obtaining higher paying employment, he is well-educated with multiple degrees, including a Master's Degree in Administrative Studies from Boston University.

Mr. Ayele has had a history of employment as a parking attendant, a security guard, and an airline ramp agent.  His educational accomplishments and his persistent efforts in applying for hundreds of jobs attest to the likelihood that he will eventually obtain employment, particularly if the economy improves.  Given his long history of hourly wage jobs, however, the Court concludes it is unlikely that Mr. Ayele will be able to obtain employment as a paralegal or as an administrator without additional course work to burnish his skills.  Mr. Ayele is intelligent and resourceful as exemplified by his efforts in representing himself in his bankruptcy case and in this proceeding.  In addition, he spends his spare time writing a book.  Although his health issues pose some challenges, they are not debilitating in the sense that he is disabled from obtaining employment and his future prospects are not hopeless.  While Mr. Ayele introduced evidence concerning his job history, his current unemployment situation, and his health issues, the evidence he presented suggests hardship.  Mr. Ayele did not submit sufficient evidence to permit a finding of "undue hardship." This is particularly the case in view of the First Circuit's observation that a debtor must demonstrate that his circumstances will prevent him from

18

working for the foreseeable future, and Congress's judgment that the fresh start does not

automatically apply to student loan debtors.  *See* <u>Nash</u>, 446 F.3d at 190-91.  Accordingly,

the Court finds that the Debtor failed to sustain his burden of proof under the "totality of

the circumstances test." Accordingly, he also failed to satisfy the more stringent <u>Brunner</u>

test in that he submitted no evidence of good faith efforts to repay his loans.  Indeed, he

attempted to discharge them in the early 1990s in a prior bankruptcy case.

The Court recognizes that Mr. Ayele's financial situation - - especially the duration

of unemployment compensation benefits, and the continuation of his existing expenses,

coupled with his desire to provide for his sister's family - - is not enviable.  Were he to lose

his unemployment compensation without obtaining employment, his financial position

could become precarious.  Were he to participate in the Ford Program, however, he would

not be obligated to repay his student loan debt unless his prospects improved dramatically.

Mr. Ayele testified that he considered and understood the options under the Ford

Program which are available to him but rejected them.  As the panel in <u>Bronsdon</u> observed,

in considering the Ford Program as a factor in determining whether the debtor has shown

undue hardship under the totality of the circumstances test, courts must "evaluate both the

benefits and drawbacks of the program for the individual debtor within his or her unique

circumstances." 435 B.R. at 803 (citing <u>Brooks v. Educ. Credit Mgmt. Corp. (In re Brooks)</u>,

406 B.R. 382, 393 (Bankr. D. Minn. 2009)).

The Court concludes that Mr. Ayele's eligibility for an ICR Plan or participation in

the IBR program supports its determination that his student loan debt is not dischargeable.

19

As this Court observed in <u>Stevenson</u>, however, it has reservations about the prospective discharge of a potential tax liability. Accordingly, the Court has taken a slightly different route to achieve the type of equitable result espoused by the court in <u>Brunell v. Citibank (S. Dakota), N.A. (In re Brunell)</u>, 356 B.R. 567 (Bankr. D. Mass. 2006), in which the court determined that "to the extent that the Debtor is obligated under any tax liability as may exist under the tax laws in effect at that time, the presence of any such liability at the end of one's working life would be a tremendous undue hardship incurred as the result of the student loan." 356 B.R. at 580–81. In <u>Brunell</u>, the court held that "[t]o the extent that the Debtor satisfies the requirements for participation in the Ford Program, any tax liability based on the forgiven balance at that time is discharged." <u>Id.</u> at 581. *See also* <u>Fahrenz v. Educ. Credit Mgmt. Corp. (In re Fahrenz)</u>, No. 05–1657, 2008 WL 4330312 (Bankr. D. Mass. 2008).

As noted in <u>Stevenson</u>, the Court agrees with those courts which have ruled that § 105(a) gives the bankruptcy court authority to fashion equitable relief in appropriate circumstances in student loan discharge cases. Like the <u>Stevenson</u> case, this case cries for a form of equitable relief. Accordingly, the Court shall enter an order discharging any student loan debt Mr. Ayele is unable to repay following his participation in the Ford Program. If Mr. Ayele were to participate in the Ford Program and so inform the Court, and if he faithfully abides by the terms and provisions of either the IBR program or an ICR Plan, then the Court prospectively discharges any student loan debt which he may have at the expiration of the plan period so as to avoid any negative tax consequences.

20

## V. CONCLUSION

For the foregoing reasons, the Court shall enter a judgment in favor of the Defendant and against the Plaintiff with the proviso that if Mr. Ayele informs the Court within 14 days of the date of this decision that he will participate in the Ford Program and, if he represents that he in good faith will abide by the provisions of the IBR program option or the ICR Plan option, then the Court shall enter a judgment partially discharging his student loan debt to the extent any remains at the expiration of the repayment plan.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  February 8, 2012